# In the United States Court of Federal Claims

No. 20-1323
(Filed:  26 January 2021[*])

```
*****************************************
SYNEREN TECHNOLOGIES CORP.,        *
                                   *
                Plaintiff,         *
                                   *
v.                                 *
                                   *   Bid protest; National Oceanic and
THE UNITED STATES,                 *   Atmospheric Administration ("NOAA");
                                   *   technical approach; past performance.
                Defendant,         *
                                   *
and                                *
                                   *
DOWLESS & ASSOCIATES, INC.,        *
                                   *
                Defendant-Intervenor.  *
                                   *
*****************************************
```

     *Jon D. Levin*, of Maynard, Cooper & Gale, P.C., with whom were *W. Brad English*, *J. Dale Gipson*, *Emily J. Chancey*, and *Michael W. Rich*, all of Huntsville, AL, for plaintiff.

     *Brendan D. Jordan*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Jeffrey Bossert Clark*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Steven J. Gillingham*, Assistant Director, all of Washington, DC, for defendant.

     *Isaias Alba IV*, of PilieroMazza PLLC, of Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**HOLTE, Judge.**

     Plaintiff, Syneren Technologies Corp. ("plaintiff" or "Syneren"), brings this bid protest challenging the National Oceanic and Atmospheric Administration's ("NOAA" or "the agency") award of a contract for upper air atmospheric monitoring technical and support services to defendant-intervenor Dowless & Associates, Inc. ("defendant-intervenor" or "Dowless") under

---

[*] This Opinion was originally filed under seal on 21 January 2021 pursuant to the protective order in this case.  The Court provided the parties until 25 January 2021 to submit redactions, if any, before the Opinion is released for publication.  On 25 January 2021, the parties emailed informing the Court no party seeks redaction of the Opinion.  The Opinion is now reissued for publication in its original form.

Solicitation No. 1305M220FNWWG0056.  Pending before the Court are plaintiff's motion for judgment on the administrative record and the government's cross-motion for judgment on the administrative record.  For the following reasons, the Court **DENIES** plaintiff's motion for judgment on the administrative record and **GRANTS** the government's cross-motion for judgment on the administrative record.

# I. Background

## A. The Solicitation

After conducting market research for a "re-compete of a requirement previously fulfilled under . . . Task Order 0030," NOAA issued Request for Quotation No. 1305M220FNWWG0056 ("RFQ" or "solicitation") for a "non-personal services task order to provide technical and administrative support" for its upper air programs on 17 December 2019.  Admin. R. ("AR") at 5, 16–17.  The RFQ contemplated a one-year time and materials award with three one-year options, along with the six-month option provided for in FAR 52.217-8.  *Id.* at 17, 19 (solicitation).  This task order would be part of a "larger overall restructuring of contractual instruments from three contracts into four contracts, in which Syneren was the incumbent contractor."  Pl. Syneren Technologies Corporation's Mot. for J. on the AR and Incorporated Brief ("Pl.'s MJAR") at 16, ECF No. 27 (citing AR at 463 (Contracting Officer's Statement of Relevant Facts)).[1]

The RFQ sought technical and administrative support for the National Weather Service ("NWS"), Surface and Upper Air Division ("SUAD"), Office of Observations ("OSB"), to include "[t]he Advanced Weather Interactive Processing System ('AWIPS'), Radiosonde Replacement System ('RRS'), and other upper air programs," "[t]he Radio Frequency Migration Project ('RFMP')," and conducting "the necessary reliability and maintainability analysis to monitor and evaluate system and network equipment performance."  AR at 17 (solicitation).  The RFQ also called for "[t]echnical writing and web page maintenance support to meet the goals and objectives of the National Weather Service," as well as "engineering, budgeting, budget tracking, and documentation support."  *Id.*

The RFQ stated the contract would be awarded to the "offeror whose quote represents the best value to the government, price and non-price factors considered."  *Id.* at 19 (solicitation).  Quotes were to be evaluated on the basis of the following three factors in descending order of weight:  (1) technical approach, (2) past performance, and (3) price.  *Id.* at 18–19 (solicitation).

As part of technical approach, the government required quotes to address "incumbent capture methodology, the vendor's phase-in strategy and approach to performing the work without disrupting or compromising effective and efficient operations."  *Id.* at 18 (solicitation).  Quotes were also required to include "all associated schedules [offerors] believe are required from the start of phase-in to the full assumption of task order responsibilities."  *Id.*  The

---

[1] During oral argument, defendant-intervenor reiterated "this contracting effort was part of a descoping.  So Syneren was the incumbent, but the contracts were not identical to the solicitation they were performing before."  Tr. at 21:21–22:1.  Plaintiff concurred "to the extent there is a change and there's a descoping, we agree."  Tr. at 42:21–22.

government's final technical approach requirement was to "[i]dentify any risks associated with [the offeror's] approach and proposed mitigation methods." *Id.* Under past performance, the government required quotes to "provide information on no more than three (3) of the firm's most recently completed contracts/orders . . . for like or similar work." AR at 18 (solicitation). The RFQ instructed past performance references to "provide a detailed explanation demonstrating the relevance of the contract/order to the requirements of the solicitation." *Id.* To assess past performance, the RFQ explicitly stated the government could consider information from the Contractor Performance Assessment Reporting System ("CPARS"). *Id.* at 18–19.

The RFQ stated the contractor would be required to provide five full-time positions, each at 1,880 hours per year: a Subject Matter Expert (SME IV), an Engineer (Eng IV), a Tech Writer (Tech Writer IV), a Web Master (Web Programmer II), and a Technician II (Tech Spec II). *Id.* at 39. The RFQ required quotes be submitted by 10 January 2020. *Id.* at 20.

### B. Plaintiff's Proposal

Two offerors, Syneren and Dowless, submitted quotes. *Id.* at 131 (First TET Consensus Report). Since this task order would be "part of a larger overall restructuring of contractual instruments from three contracts into four contracts, in which Syneren was the incumbent contractor," plaintiff emphasized the superiority of its incumbency capture "no fewer than 20 times." Pl.'s MJAR at 14, 16 (citing AR 463 (Contracting Officer's Statement of Relevant Facts)). To illustrate its incumbency capture ability, plaintiff described "5 out of 5 required incumbent Syneren staff to start on Day 1." AR at 95 (plaintiff's proposal). Plaintiff also proposed a phase-in strategy consisting of salary escalations and a one-day transition. *Id.* at 96–100. Plaintiff's final price estimate was $3,458,275.60. *Id.* at 117.

### C. Defendant-Intervenor's Proposal

Defendant-intervenor was "currently performing similar services within the NWS," and since the RFQ prioritized incumbent capture, defendant-intervenor proposed to ensure incumbent staff "salaries and benefits are as good or better than they currently are," and "selected employees will get improved salaries and benefits." *Id.* at 65 (defendant-intervenor's proposal). To guarantee successful transition, defendant-intervenor proposed a phase-in process to "seamlessly transition the current staff to Team Dowless while maintaining operations without disruption." *Id.* Defendant-intervenor proposed to enlist Tesla Laboratories ("Tesla") and ITegrity as subcontractors to fulfill the government's task order. *Id.* According to defendant-intervenor, both "are very knowledgeable about NWS upper air observations management, understand the administration and operations of NOAA, plus they greatly expand the socio-economic diversity" of the offering. *Id.* Tesla and ITegrity submitted past performance references to support defendant-intervenor's bid. *Id.* 79–82. Defendant-intervenor's final price estimate was $3,053,376.85. *Id.* at 87.

### D. First Award Decision

Following the two quote submissions, a technical evaluation team ("TET") rated both plaintiff and defendant-intervenor as acceptable in both the technical approach and past

performance categories.  AR at 135 (First TET Consensus Report).  Plaintiff's price estimate was $404,898.75 more than defendant-intervenor's.  *Id.* at 145 (First Award Selection Memorandum).  The CO noted "[t]he TET concluded that there were no notable difference [sic] in either quote.  The TET believes both vendors would perform successfully if either company was awarded the task order."  *Id.* at 146.  The CO found "a very minor discernable difference between the two quotes in the area of past performance," with defendant-intervenor "having slightly higher quality."  *Id.*  The CO then awarded the contract to defendant-intervenor on the grounds "there is no additional value received from Syneren to justify the price premium associated with their quote."  *Id.*

### E.  First GAO Protest and Corrective Action

On 5 March 2020, plaintiff protested the award at the Government Accountability Office ("GAO").  *Id.* at 216 (First GAO Protest).  Plaintiff asserted the following grounds:  (1) "its mitigation risk should have been zero"; (2) "the Agency failed to consider risk associated with relying entirely on subcontractor performance"; and (3) "the Agency leveled quotations and considered price, essentially turning the competition into a low price technically acceptable evaluation."  AR at 222–24.  After "careful consideration of the issues raised in Syneren's protest," the government decided to take corrective action and reevaluate the proposals.  *Id.* at 314 (Corrective Action Notice).  If necessary, the government would "terminate the award to Dowless and award a new contract if appropriate."  *Id.*  The government further indicates "when an agency action undertakes a new evaluation of proposals, the agency action renders a protest of the original evaluation and award decision academic."  *Id.* (internal citation omitted).  Following the government's decision to take corrective action, the GAO dismissed plaintiff's protest as moot.  *Id.* at 316 (First GAO Decision).

### F.  Reevaluation of Proposals

#### 1.  The Government's Reevaluation of Plaintiff's Proposal

The government tasked a different TET to perform the reevaluation of the offerors' non–price proposal volumes.  AR at 317 (Second TET Consensus Report).  The government found plaintiff had an acceptable technical approach and outstanding past performance.  *Id.* at 330–36.  The government assessed plaintiff one significant strength, three strengths, four weaknesses, and one significant weakness.  *Id.* at 330–331.  Plaintiff's significant strength was for its position as the incumbent contractor, as the government stated:

> The fact that Syneren is the incumbent contractor provides benefit to the Government and Upper Air Program by retaining team members with corporate knowledge, vital skills and relevant abilities in order to support Upper Air program requirements. This also will eliminate the detrimental effects of low incumbent capture and employment-related anxiety on Upper Air Program Team Members' morale that may result from a loss of expertise.

*Id.* at 330.  Plaintiff's significant weakness was due to plaintiff proposing "two part-time individuals as SME IVs" to provide direction to the staff and communication with the

government.  *Id.*  The government decided plaintiff's proposal to split this responsibility between two people represented a "significant risk to the Government that the tracking, reporting, monitoring, and checking of deliverables would not be consistent amongst the two part-time team leads."  *Id.*

The government assigned a weakness for plaintiff's plan to give its employees an annual pay raise, which the government believed represented a "cost control" problem.  AR at 331 (Second TET Consensus Report).  The government noted plaintiff provided "no mention of how the company will manage and control cost of the increases in pay and benefits from current prices to the new prices."  *Id.*  The government also assigned a weakness for plaintiff's proposed one-day transition period, which the government determined to be risky.  *Id.*  The government assigned a third weakness because it believed plaintiff failed to:  (1) provide analysis of the risk associated with transition; (2) describe its plan for mitigating the risk; (3) explain how it would implement the planned mitigation; and (4) propose to track the mitigation.  *Id.*

The TET rated plaintiff's incumbent status a "significant strength."  *Id.* at 330.  The TET also observed plaintiff's "very high employee retention rate," "well-documented and tested Phase-In Plan," and use of standard operating procedures were strengths.  *Id.*

### 2.  The Government's Reevaluation of Defendant-Intervenor's Proposal

The TET rated defendant-intervenor's proposal "good" in the technical approach factor, assigning it a significant strength, five strengths, and two weaknesses.  AR at 322–23 (Second TET Consensus Report).  Defendant-intervenor's significant strength was related to its incumbent capture methodology.  *Id.* at 322.  The government also stated "the salaries and benefits offered by [defendant-intervenor] will be in all cases as good or better than the incumbent employee's current company will."  *Id.*

The government rated defendant-intervenor's past performance acceptable.  *Id.* at 325.  The government also prepared a table comparing the two offerors' overall pricing and hourly rates, which showed defendant-intervenor's proposed rates were lower than plaintiff's in every labor category.  AR at 345 (Second Best Value Determination Memorandum).

### G.  Second Award Decision

The CO's tradeoff analysis selected defendant-intervenor over plaintiff and found the TET report "contain[ed] sufficient information to make a sound, supportable, business award decision."  *Id.* at 346–48.  According to the CO, plaintiff's technical approach "introduced a level of moderate risk associated with their insufficient time to transition and failure to address a mitigation strategy should the transition take longer than anticipated."  *Id.* at 340 (Second Best Value Source Selection Trade-Off Memorandum).  The government's restructuring of contractual instruments would "[a]t a minimum, . . . require an adjustment on Syneren's part to realign resource [sic] to provide support specifically to the Upper Air Program."  *Id.* at 347 (Second Best Value Determination Memorandum).  Based on the TET's findings and the CO's own independent judgment of non-price and price factors, defendant-intervenor's quote

represented the best value to the government.  *Id.* at 348.  The CO informed defendant-intervenor of its contract award on 12 June 2020.  *Id.* at 351 (second notification of award).

### H.  Second GAO Protest

Plaintiff filed a second GAO protest on 18 June 2020, challenging "the agency's evaluation of quotations and the best-value tradeoff decision."  AR at 552 (Second GAO Decision).  First, plaintiff argued the government erred in assigning a significant weakness to its proposal of splitting a subject matter expert ("SME") IV team lead position between two part-time staff employees because the solicitation did not explicitly require a single point of contact.  *Id.* at 553.  The government contended it was reasonable to conclude the assignment of a leadership role to two different people could pose a risk to unity of effort, and the GAO agreed.  *Id.* at 553–54.  Defendant-intervenor's proposal, on the other hand, proposed to fill the team lead position with one full-time employee.  *Id.* at 553.  The GAO concluded "the quotations were not meaningfully the same in this respect, and the protestor's arguments are not consistent with the record."  *Id.* at 555.

Plaintiff further challenged the government's assignment of a weakness to its proposed one-day transition period, arguing one day "was entirely reasonable because the UAOS requirements of the current task order are substantially the same as the relevant portions of the previous task order."  *Id.* at 555–56.  The government explained the requirements related to several programs supported under the prior task order were not within the scope of the current task order; accordingly, the assigned weakness represented a concern that plaintiff may have underestimated the work required to transition employees.  AR at 556 (Second GAO Decision).  Having considered the contemporaneous record, the GAO concluded the government's concern was reasonable and plaintiff's disagreement with the government's judgment was insufficient to establish unreasonableness.  *Id.*

Plaintiff also challenged the government's assignment of a cost control risk weakness to its plan of providing two percent annual salary escalation for two reasons.  *Id.* at 556–57.  First, plaintiff argued the government is only bound to pay the agreed-upon rates for time and materials contracts; and second, plaintiff argued the government's assertion it could not assess how plaintiff would manage and control salary costs is irrational because plaintiff outlined exact rates in its proposal.  *Id.* at 556–57.  The GAO noted even if plaintiff was correct in arguing error, "it is not clear that the protestor was prejudiced by this error."  *Id.* at 557.  The GAO also noted the best-value determination made no reference to either proposal's cost control weaknesses, so it was unlikely that the CO considered or adopted the alleged erroneous weakness.  *Id.*

The GAO found the government's response to each challenge to be consistent with the record and applicable law.  *Id.* at 559.  The GAO denied plaintiff's protest on 25 September 2020.  *Id.* at 551.

### I.  Procedural History Before This Court

On 5 October 2020, plaintiff filed its complaint in this bid protest, a motion to file the complaint under seal, and a motion for protective order.  *See* Compl., ECF No. 1; Pl.'s Mot. for Leave to File Under Seal, ECF No. 2; Pl.'s Mot. for a Protective Order, ECF No. 3.  Pursuant to the Court's 7 October 2020 Order, later on 7 October 2020, the parties filed a joint status report with a proposed schedule.  *See* Order, ECF No. 9; Joint Status Report, ECF No. 10.  Also on 7 October 2020, defendant-intervenor filed a motion to intervene, which did not state whether the motion was opposed.  *See* Dowless & Associates, Inc.'s Mot. to Intervene, ECF No. 11.  The Court held an initial telephonic scheduling conference on 8 October 2020.  *See* Order, ECF No. 9.  Also on 8 October 2020, plaintiff refiled an unopposed motion for protective order and a redacted complaint.  *See* Unopposed Mot. for Protective Order, ECF No. 13; Syneren Technologies Corp.'s Compl., ECF No. 14.  Additionally on 8 October 2020, the Court granted plaintiff's motion to file the complaint under seal, defendant-intervenor's motion to intervene, and plaintiff's second motion for protective order, along with setting the briefing schedule. Order, ECF No. 15.

On 20 October 2020, the government filed the administrative record.  *See* AR, ECF No. 24.  On 2 November 2020, plaintiff filed an unopposed motion for enlargement of time, which the Court granted on the same day.  *See* Unopposed Mot. For Enlargement of Schedule, ECF No. 25; Order, ECF No. 26.  On 6 November 2020, plaintiff filed its motion for judgment on the administrative record ("MJAR").  *See* Pl. Syneren Technologies Corporation's Mot. for J. on the Admin. R. and Incorporated Brief ("Pl.'s MJAR"), ECF No. 27.  On 20 November 2020, the government filed its cross-MJAR and opposition to plaintiff's MJAR.  *See* Def.'s Cross-Mot. for J. on the Admin. R., and Opposition to Pl.'s Mot. for J. on the Admin. R., ECF No. 28 ("Def.'s Cross-MJAR").  On 30 November 2020, plaintiff filed its reply in support of its MJAR and response to the government's cross-MJAR.  *See* Pl. Syneren Technologies Corp.'s Reply in Supp. of Its Mot. for J. on the Admin. R. and Resp. to Def.'s Cross-Mot. for J. on the Admin. R., ECF No. 29 ("Pl.'s Reply and Resp.").  On 9 December 2020, the government filed its reply. *See* Def.'s Reply in Supp. of Its Cross-Mot. for J. on the Admin. R., ECF No. 30 ("Def.'s Reply").  Defendant-intervenor did not file any briefs related to the cross-MJARs.  The Court held oral argument on the parties' cross-MJARs on 6 January 2021.  *See* Order, ECF No. 33.

## II.  Legal Standards

### A.  Bid Protest Jurisdiction & APA Standard of Review

The Tucker Act provides this Court jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  To be an interested party, a protestor must show that it is an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award or failure to award the contract." *PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1356 (Fed. Cir. 2018) (internal quotation marks and citations omitted).

In rendering such judgment, this Court "review[s] the agency's decision pursuant to the standards set forth in section 706 of title 5" of the Administrative Procedure Act ("APA").

§ 1491(b)(4); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). "Among the various [Administrative Procedure Act] standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. §706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)).  Under this standard, "a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43).  "The arbitrary and capricious standard applicable here is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 283 (1974)).

### B.  Judgment on the Administrative Record in a Bid Protest

RCFC 52.1(c) "provides for judgment on the administrative record."  *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011).  Rule 52.1(c) was "designed to provide for trial on a paper record, allowing fact-finding by the trial court."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

This Court may set aside a contract award if:  "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa*, 238 F.3d at 1332.  "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).  "[D]e minimis errors do not require the overturning of an award."  *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996).  "De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are."  *Id.* (internal quotation marks omitted) (quoting *Andersen Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992)).  A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced [it]" by showing "there was a 'substantial chance' it would have received the contract award but for the errors."  *Bannum, Inc.*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

Technical ratings fall within a category of "discretionary determinations of procurement officials that a court will not second guess."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).  "Procurement officials have substantial discretion to determine which proposal represents the best value for the government."  *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (citing *E.W. Bliss*, 77 F.3d at 449).  A protester alleging unequal

treatment in a technical evaluation "must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Office Design Group v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).

### C. Permanent Injunction

When deciding whether a permanent injunction is warranted, a court considers:

(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

## III. Parties' Arguments

### A. Whether the Government's Technical Evaluation Was Arbitrary, Irrational, or Contrary to Law

#### 1. Whether the Government Assigned Plaintiff Irrational Weaknesses

Plaintiff argues the Court should set aside the procurement decision because the government's "evaluation of proposals was arbitrary, irrational, and/or contrary to law." Pl.'s MJAR at 13. Plaintiff first argues the government's evaluation of plaintiff's proposal was arbitrary and capricious because the government assigned plaintiff irrational weaknesses. *Id.* The weaknesses plaintiff identifies as being irrationally assigned are: (1) "that its one day transition was risky"; (2) "that it failed to describe the risks associated with its proposed approach"; and (3) its "plan to give its employees an annual salary escalation, which the Agency believed represented a 'cost control' problem." *Id.* at 16–17 (citing AR at 331 (Second TET Consensus Report), 343 (Second Best Value Determination Memorandum)).

Plaintiff responds to the first two identified weaknesses by arguing "[t]here was literally nothing for Syneren to do—the same employees who'd been walking through the doors to work for the Agency under the prior contract would walk through the doors to work for the Agency under the new contract." *Id.* at 16. Plaintiff responds to the third identified weakness by noting: (1) the RFQ did not disallow raises for employees and "it is industry practice to adequately compensate employees"; (2) concerns over cost control are "totally irrational" because "the contract contemplated by the RFQ is a time and materials contract—not a cost contract," meaning the government "is merely bound to pay the agreed upon rates," regardless of the cost to the contractor; and (3) plaintiff proposed "a modest 2% annual escalation for each labor category." *Id.* at 17.

The government explains "the upper air procurement is 'part of a larger overall restructuring of contractual instruments from three contracts into four contracts,' which at the very least will 'require an adjustment on Syneren's part to realign resource[s] to provide support specifically to the Upper Air Program.'"  Def.'s Cross-MJAR at 20.  The government asserts plaintiff's belief "there was literally nothing for Syneren to do" reveals "its flawed understanding of the current procurement as being 'identical' to the contract for which it was an incumbent." *Id.*  Rather, the contracts "were not precisely identical as many tasks from the current contract were decoupled from each other as part of an overall restructuring.'"  *Id.* (citing AR at 347 (Second Best Value Determination Memorandum).  The government also argues plaintiff "still should have budgeted enough time to allow for a margin of error . . . [g]iven the uncertainty inherent in any transition involving many moving parts."  *Id.*

The government also argues it was not unreasonable for it to treat plaintiff's proposed salary increases as a weakness because "it was reasonable for the agency to fear that salary increases could get out of hand if, for example, market conditions caused salaries for the types of positions contemplated in the RFQ to greatly increase."  *Id.* at 22.  The government adds even if it was in error, there was no prejudice to plaintiff because the government assigned this weakness to defendant-intervenor as well.  *Id.*

Plaintiff also asserts it was "unreasonable" for the government to assign "a significant weakness for splitting the SME IV position into two part-time personnel."  Pl.'s MJAR at 18 (citing AR at 330 (Second TET Consensus Report), 343 (Second Best Value Determination Memorandum)).  Plaintiff argues the RFQ did not require the position, which provides direction to the staff and communicates with the agency, to be held by a single person, thus the government "unreasonably veered from the RFQ's criteria in assigning a weakness for a bifurcated point of contact."  *Id.* at 18 (citing AR at 331 (Second TET Consensus Report)).

The government responds plaintiff's proposal to have two individuals split the SME IV team lead role is a significant risk because the position "is responsible for providing 'direction, leadership, coordination for the rest of the staff . . . [and] ensuring that the deliverables and reports are generated and submitted to the Government in a high quality and timely manner.'" Def.'s Cross-MJAR at 18 (quoting AR at 101).  The government asserts it was reasonable for the CO to conclude "having two individuals occupy such an important role would 'jeopardiz[e] the unity of effort in the overall work performed' and create the risk that tracking, reporting, monitoring, and checking of deliverables would not be consistent between the two individuals." *Id.* at 18–19 (citing AR at 330–31 (Second TET Consensus Report), 347 (Second Best Value Determination Memorandum)).

The government responds plaintiff "incorrectly understands the role 'incumbent capture' played in the procurement," and the contract "was not a pro forma exercise designed to simply renew Syneren's existing role with respect to the upper air programs."  *Id.* at 17.  The government explains it considered offerors' "[t]echnical ability, regular reporting, and transition planning" along with the incumbent capture methodology.  *Id.* at 18.  More broadly, the government argues it cannot be the standard "that any practice not expressly prohibited by the RFQ cannot constitute a weakness for evaluation purposes."  *Id.* at 19.

      **2.  Whether the Government Treated Plaintiff and Defendant-Intervenor Equally and Whether Strengths Assigned to Defendant-Intervenor Were Rational**

Plaintiff also argues the government did not treat plaintiff and defendant-intervenor equally in "irrationally assigning strengths to [defendant-intervenor's] proposal." Pl.'s MJAR at 18. First, plaintiff argues the government's assignment of a strength for defendant-intervenor's four-month transition period as being a "methodical timeline of transition within a reasonable time" falls short of its desire to perform the work "without disrupting or compromising effective and efficient operations." *Id.* at 19 (citing AR at 19 (solicitation), 72 (defendant-intervenor's proposal), 322 (Second TET Consensus Report)). Plaintiff explains while the government "dwells heavily on the risk of Syneren's one-day transition—for its own employees already at the Agency—the Agency assigned Dowless a strength for an inordinately long transition period." *Id.* Plaintiff describes the government's treatment of a four-month transition as a strength as being "unequal treatment when compared with the risk" the government assigned to plaintiff's one-day transition. *Id.*; *see* AR at 331 (Second TET Consensus Report).

The government responds it did not assign a strength to plaintiff's proposed one-day transition period because plaintiff "wrongly conflates transition time with disruption." Def.'s Cross-MJAR at 20. According to the government, "[a] smooth, non-disruptive transition, which is what the RFQ calls for, would likely take more time than an abrupt and unsettling transition. Just as a transition that is too long may cause disruption, so too can a transition that is too short." *Id.* at 20–21.

Plaintiff also argues the two part-time employees it proposed for the SME role are part of the incumbent personnel the government values; therefore replacing them with a single individual "would introduce risk," something the government failed to consider when evaluating defendant-intervenor's proposal. Pl.'s MJAR at 19–20.

The government explains "the RFQ did not require the retention of all current workers on the upper air programs. It would be entirely consistent with full incumbent capture for Dowless to select only one of the two SME IV workers to work full time in the position." Def.'s MJAR at 19.

**B.  The Parties' Arguments Regarding NOAA's CO's Award Rationale**

Plaintiff argues the CO "failed to recognize obvious evaluation errors and compounded them with an irrational source selection decision." Pl.'s MJAR at 20. Plaintiff argues the CO "allowed obvious evaluation errors to infect her source [s]election [d]ecision" and asserts this means "the resulting source selection decision is itself arbitrary and capricious." *Id.* at 20.

Plaintiff also argues the CO "failed to consider key risks in [defendant-intervenor's] proposal." *Id.* at 21. The first area plaintiff states the government failed to consider is its assignment of a significant strength to defendant-intervenor for offering benefits and salaries "as good as or better than" plaintiff's rates, even though defendant-intervenor "actually offered lower rates, which the Contracting Officer knew and included in her decision." *Id.* (citing AR at

322 (Second TET Consensus Report), 345, 347 (Second Best Value Determination Memorandum)).  According to plaintiff, these "two findings are at odds" and although defendant-intervenor might have considered charging the government less than it paid its employees, defendant-intervenor's proposal does not indicate any intention of doing so.  *Id.* at 21–22.  The second risk plaintiff states the government failed to consider relates to the CO's decision to adopt "the TET's elaborate finding that two of the three past performance evaluation [sic] for [defendant-intervenor] were so unclear and wanting that [the TET] questioned whether the ratings were accurate."  *Id.* at 22 (citing AR at 328–29 (Second TET Consensus Report)).  Plaintiff asserts an inconsistency between the CO's decision to agree with the TET about the lack of clarity of the evaluations and the CO's finding "that they were not so unclear that she couldn't give [defendant-intervenor] a better rating."  *Id.* [emphasis omitted].

Regarding cost control, the government argues because the contract "does not contemplate a price realism assessment, there is nothing inappropriate about a contractor proposing a price that is below its costs."  Def.'s Cross-MJAR at 22 (citing AR at 559 (Second GAO Decision)).  The government asserts because it is on the offeror to take the risk, "it was not inconsistent for [defendant-intervenor] to claim that it would increase worker salaries and offer a price that is below its costs."  *Id.*  The government also argues the CO rationally determined defendant-intervenor's past performance, and plaintiff's "argument fails to account for the fact that the Contracting Officer's assessment of [defendant-intervenor's] Past Performance relied on her own independent judgement."  *Id.* at 23 (citing AR at 348 (Second Best Value Determination Memorandum)).

The government also argues the CO "reasonably concluded that [defendant-intervenor's] 'Good' Technical Approach and Past Performance at the 'high end' of 'Acceptable' were superior to Syneren's 'lower end of Acceptable' Technical Approach and 'Outstanding' Past Performance."  *Id.* at 23 (citing AR at 339–40 (Second Best Value Source Selection Trade-Off Memorandum), 347–48 (Second Best Value Determination Memorandum)).  The government notes defendant-intervenor was also the lower priced of the two proposals, and "[i]t would have been irrational for the agency to award the Task Order to a bidder who was evaluated less highly on non-price factors and who offered a price $400,000 more than its better-rated competitor."  *Id.* at 23–24.

## IV.  Analysis

Based on the parties' arguments outlined *supra*, the Court's analysis of plaintiff's arguments flow in logical progression of how they relate to one another.  The Court initially considers the similarity of the solicitation to the previous contract, for which plaintiff is the incumbent.

### A.  Whether the Contract is the Same as the Previous Contract

Plaintiff argues the CO's market research acknowledges plaintiff as "the incumbent contractor for the same work."  Pl.'s MJAR at 14 (citing AR at 1–2, 5 (CO's Market Research Report)).  The government noted the CO's market research report "predated the solicitation, was not widely circulated, and was a passing remark" and instead argues the "procurement was not a

pro forma exercise designed to simply renew Syneren's existing role with respect to the upper air programs." Tr. at 31:12–14; Def.'s Cross-MJAR at 17.

Plaintiff further explained, "the difference between the task orders [in the two contracts] is that there are currently three task orders. . . .  The primary difference is that [the] ASOS and upper air [task order is] being divided into two task orders, and that accounts for the difference." Tr. at 35:19–25.  According to plaintiff, there is no "substantial difference" between the prior contract and the current solicitation because the "contracting officer said in her market research that this is the identical work and it's the same scope and Syneren is the incumbent, and the requirements didn't change from the market research to the solicitation/PWS . . . ." *Id.* at 36:8–16.

According to the government, plaintiff's "misunderstanding of [the change in scope of the contract] is a big reason why they were assigned weaknesses in the technical evaluation approach and is a major reason why the contract was not awarded to them." *Id.* at 32:11–14. The government argued plaintiff's proposal failed to address a significant change to the new solicitation, which was the "descoping and restructuring of the weather observation overall program, and a major part of that was the separation of the upper air from the ASOS." *Id.* at 36:20–25.  The government explained the 8 October 2019 task order overview only contains three bullet points describing required technical and administrative skills, while the 11 January 2018 task order overview contains five. *Id.* at 38:6–12 (citing AR at 38 (solicitation); 490 (NOAA Performance Work Statement for Operations Technical Support Services, 11 January 2018)).  When the Court asked whether the difference simply reflected the new task order overview dropping two of the five tasks, the government explained the dropping of two tasks "reflects the overall understanding that the work was being descoped.  So the ASOS tasks were . . . separated out from the upper air program." *Id.* at 38:19–21; 39:2–6.

The only substantive change from the 2018 task order overview to the 2019 task order overview is the removal of two of the five required skills.  *Compare* AR at 38 (solicitation) *with* AR at 490 (NOAA Performance Work Statement for Operations Technical Support Services, 11 January 2018).[2]  The three technical and administrative skills listed in the 2019 task order are identical to those listed in the 2018 task order except for minor stylistic differences.  *Compare* AR at 38 (solicitation) *with* AR at 490 (NOAA Performance Work Statement for Operations Technical Support Services, 11 January 2018).  The significant similarity of the task order overviews weighs in favor of plaintiff's argument for continuity between the contracts.[3]  The government is correct, however, in asserting the contracts are not mirror images, and it is not unreasonable for the government to exercise caution while restructuring a series of contracts, especially when there is likelihood for contracted workers to be switching to different projects.

---

[2] The 2018 requirements dropped in the 2019 task order overview are "[t]he Automated Surface Observing Systems program (ASOS) maintenance, ASOS engineering, ASOS system performance, and surface equipment and hydrology," and "[t]he National Weather Service's (NWS) Cooperative Observer Program (COOP) and the COOP's Cooperative Station Service Accountability (CSSA) database and metadata system."  *Compare* AR at 38 (solicitation) *with* AR at 490 (NOAA Performance Work Statement for Operations Technical Support Services, 11 January 2018).

[3] The government noted: "one place where one can look to see where this [descoping and restructuring] manifests is if you compare, for example, administrative record page 38 with administrative record page 490 . . . ."  Tr. at 37:1–5.

- 13 -

The Court finds the government was rational in treating the contracts as having some relevant differences in assessing the offers.  The Court's finding here will be incorporated into its analysis of the parties' arguments *infra*.

### B.  Whether the Government Rationally Evaluated the Parties' Proposed Pricing

#### 1.  The Rationality of Defendant-Intervenor Offering the Government a Lower Price While Promising to Increase Employee Salaries

The TET assigned defendant-intervenor a significant strength for its incumbent capture methodology as part of its overall technical approach rating of good, noting defendant-intervenor will "reassure the incumbent employees about their job security and their roles on the new contract" through "open and honest communication with incumbent staff and superior salary and benefits."  AR at 322 (Second TET Consensus Report).  The government emphasized "the salaries and benefits offered by Team Dowless will be in all cases as good or better than the incumbent employee's current company will."  *Id.*  Defendant-intervenor's proposal promised to "reassure the current staff that the transition to Team Dowless will not adversely affect their salary and benefits and that in many case [sic] they will obtain more benefits."  *Id.* at 72 (defendant-intervenor's proposal).  The CO agreed with the TET's evaluation.  *Id.* at 343 (Second Best Value Determination Memorandum).

Plaintiff states the government was unreasonable in failing to consider the riskiness of its assignment of a significant strength to defendant-intervenor for offering benefits and salaries "as good as or better than" plaintiff's rates while defendant-intervenor "actually offered lower rates, which the Contracting Officer knew and included in her decision."  Pl.'s MJAR at 21–22 (citing AR at 322 (Second TET Consensus Report), 345 (Second Best Value Determination Memorandum), 347 (Second Best Value Determination Memorandum)).  According to plaintiff, these "two findings are at odds" and defendant-intervenor's proposal indicates no effort to reconcile the apparent discrepancy by charging the government less than defendant-intervenor planned to pay its employees.  *Id.*

The government explains:  "because the RFQ contemplates fixed-price fully burdened labor rates and does not contemplate a price realism assessment, there is nothing inappropriate about a contractor proposing a price that is below its costs."  Def.'s Cross-MJAR at 22.  The government notes, "because the risk and responsibility for contract costs is on the contractor, not the Government, it was not inconsistent for Dowless to claim that it would increase worker salaries and offer a price that is below its costs."  *Id.*  The government understands defendant-intervenor to be "presumably willing to accept a lower profit margin in order to provide a more competitive and better-value bid."  Def.'s Reply at 6.

The government noted at oral argument the terms of the solicitation stated the awardee "would be responsible for any cost above and beyond what's quoted" because the awardee's quoted amount is the contract's "ceiling price."  Tr. at 44:13–16; 47:12–17 (citing AR at 25 (solicitation)).  Plaintiff noted although there is a price ceiling, the government "explicitly anticipates that there could be an increase in the cost of the contract."  *Id.* at 56:20–24.  Plaintiff cited a clause stating "the contractor shall notify the contracting officer in writing whenever it

has reason to believe that the costs it expects to incur under this contract in the next 60 days, when added to all the costs previously incurred, will exceed 85 percent of the total funded amount so far allotted." *Id.* at 56:24–57:5 (citing AR at 25 (solicitation)).[4]

Plaintiff elsewhere defends its own proposed price increases by noting the government "is merely bound to pay the agreed upon rates. Syneren's actual costs are irrelevant, and would not affect the cost the Agency paid." Pl.'s MJAR at 17. Plaintiff defends its ability to control costs by noting it is "irrational" for the government to conclude "[the government] had no way of knowing how Syneren would manage its costs." *Id.* Plaintiff's assertion it has no way of knowing how defendant-intervenor would manage its costs its similarly irrational, as plaintiff provides no evidence defendant-intervenor would not honor its contractual obligations, even loss of money on the contract.

The Court recognizes the strength of plaintiff's observation the government could be responsible for additional costs if the contractor's costs reach a certain level. *See* Tr. at 56:24–57:5 (citing AR at 25 (solicitation)). Defendant-intervenor's proposal is $404,898.75 less expensive than plaintiff's, which means minor cost overruns will still save the government money, and to the extent plaintiff is concerned defendant-intervenor's costs could rise above plaintiff's proposed costs, this concern would also apply to plaintiff, since both parties offered to increase employee salaries to retain employees. *See* AR at 323, 331 (Second TET Consensus Report), AR at 340 (Second Best Value Source Selection Trade-Off Memorandum). Plaintiff's concern regarding defendant-intervenor's price is also misleading; although defendant-intervenor offered a superior price, the government rated defendant-intervenor higher on non-price factors, which it considered to be more important than price. *See* Def.'s Cross-MJAR at 13.

The Court finds plaintiff is unable to overcome the government's observation it is "entirely reasonable for the agency to have concluded that [the difference in cost between the offerors' proposals] would not come out of the employee[s'] take-home but would come from Dowless' margin, overhead, or any particular thing that would not affect the employee." Tr. at 53:14–18. The government's decision here "evince[es] rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). Technical ratings fall within a category of "discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). This analysis is also related to the Court's consideration of the relevance of a price realism analysis, discussed immediately *infra*. The Court finds the government's decision here should not be "set aside" because it is not "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004).

## 2.   The Role of Price and Cost Realism Analysis in the Dispute over the Rationality of Defendant-Intervenor's Pricing

---

[4] The clause further states: "The notice shall state the additional funds required to continue performance for the period specified in the Schedule." AR at 25 (solicitation). The solicitation states change orders shall be allowed "to exceed the amount allotted by the government specified in the Schedule, [if] they contain a statement increasing the amount allotted." *Id.*

The government noted in its defense of defendant-intervenor's pricing, "there is nothing inappropriate about a contractor proposing a price that is below its costs," because the solicitation "does not contemplate a price realism assessment." Def.'s Cross-MJAR at 22. Plaintiff responded it instead simply argued the CO failed to consider price "as a factor in whether Dowless was really offering enough to recruit and retain incumbent personnel." Pl.'s Reply and Resp. at 5. Plaintiff clarified at oral argument it does not believe its argument regarding the rationality of defendant-intervenor's price proposal "is a realism analysis because realism analysis addresses the risk of nonperformance. This is a consistency question." Tr. at 63:14-16.

Defendant-intervenor suggested if plaintiff is requesting any sort of realism analysis, it is cost realism analysis, rather than price realism analysis, because there is not "any real issue with price. It sounds to me like the question is about whether our costs are covered." *Id.* at 64:11–17. Insofar as plaintiff requests a cost realism analysis, defendant-intervenor argued, "cost realism analysis is not required for the fixed elements of [a time and materials contract], . . . therefore, [defendant-intervenor] could bid costs that were lower than—or higher, rather, than what the . . . price might allow [defendant-intervenor] to recoup." *Id.* at 64:23–65:2.

The Court agrees with the parties "that a price or cost realism analysis is not called for." *Id.* at 66:18–19. The Court understands plaintiff to not be holding the government to a realism analysis, contrary to the government's characterization.[5] Plaintiff did not inquire into whether any particular costs defendant-intervenor proposed were realistic; rather, plaintiff merely inquired as to whether defendant-intervenor's proposed price for the government matched what plaintiff anticipated defendant-intervenor's costs to be. For the reasons discussed immediately *supra*, the Court finds the government's decision to accept defendant-intervenor's commitment to increase employees' salaries while proposing a lower price than plaintiff to be rational.

### 3. Whether the Government Rationally Assigned Plaintiff a Weakness for Proposing Annual Salary Increases

The TET gave both plaintiff and defendant-intervenor weaknesses for proposing annual salary increases as part of their incumbent retention plans, which the government believed introduced a "cost control" problem. AR at 323, 331 (Second TET Consensus Report). These scores contributed to the TET's technical approach scores for defendant-intervenor of good and plaintiff's score of the lower end of acceptable. *Id.* at 322, 332. The CO agreed with the TET's evaluation. *Id.* at 346–47 (Second Best Value Determination Memorandum).

Plaintiff argues the government's "apparent concern about 'cost control' is totally irrational" because under a time and materials contract, the government "is merely bound to pay the agreed upon rates," and the contractor's "actual costs are irrelevant, and would not affect the cost the agency paid." Pl.'s MJAR at 17. Plaintiff argues only defendant-intervenor should still receive this weakness, however, because defendant-intervenor "did not know how much the

---

[5] Plaintiff stated at oral argument it merely believes there "is a clear and fundamental disconnect between the technical offer and what the price was that was proposed." Tr. at 84:22–24. Plaintiff then clarified it is not asking the government to "assess[] risk associated with the cost of performance" as a price realism analysis would require. *Id.* at 85:6–8.

incumbents earned and was much more likely to 'take a bath' if it bid substantially lower rates than Syneren." *Id.*

The government defended its assignment of a weakness on the ground "it was reasonable for the agency to fear that salary increases could get out of hand if, for example, market conditions caused salaries for the types of positions contemplated in the RFQ to greatly increase." Def.'s Cross-MJAR at 22.  The government observed even if it erred in assigning a weakness for the cost control issue, plaintiff "cannot show that it was prejudiced by this error" because "it was a weakness equally shared by both Syneren and Dowless" and the CO did not discuss "the salary increases as a weakness in her best value determination."  *Id.* (citing AR at 323, 331 (Second TET Consensus Report), 342–50 (Second Best Value Determination), 557 (Second GAO Decision)).

Regardless of whether the government was rational in attributing a weakness to plaintiff and defendant-intervenor, the government is correct:  any improvement in plaintiff's rating would necessarily mean an improvement in defendant-intervenor's rating as well.  Plaintiff's argument it deserves a better rating because it knows "how much the incumbents earned" is not a rational distinction because the information had no effect on the government's concern regarding cost mismanagement—the government still accuses plaintiff of risking cost mismanagement despite plaintiff's knowledge of the incumbent employees' salaries.  *See* Pl.'s MJAR at 17.  Plaintiff also argues the government has no contractual responsibility to pay for a contractor's cost mismanagement while also arguing defendant-intervenor provides a cost control concern to the government.  *See id.*  If plaintiff's proposal does not present a cost control concern because of the nature of the contract, neither does defendant-intervenor's proposal, since it is a proposal for the same contract.

A protester alleging unequal treatment in a technical evaluation "must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals."  *Office Design Group v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).  Plaintiff asks the government for different treatment for substantively indistinguishable deficiencies in its proposal and defendant-intervenor's proposal.  Although the government's concern over employee salaries tracking market conditions appears to be in tension with the government's strong focus on incumbent employee retention, the government was reasonable in treating the parties' substantively indistinguishable deficiencies equally.  *See id.*  Technical ratings fall within a category of "discretionary determinations of procurement officials that a court will not second guess."  *E.W. Bliss Co.*, 77 F.3d at 449.  The government's decision here "evince[es] rational reasoning and consideration of relevant factors."  *Advanced Data Concepts*, 216 F.3d at 1058.  The Court finds the government's decision here should not be "set aside" because it is not "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Banknote Corp. of Am., Inc.*, 365 F.3d at 1350–51.  Further, even were it irrational for the government to assign a weakness to both parties, plaintiff was not prejudiced because the government assigned defendant-intervenor the same weakness and the CO's evaluation did not discuss the weaknesses.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005) (A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced [it]" by showing "there was a

'substantial chance' it would have received the contract award but for the errors."); *see* AR at 342–50 (Second Best Value Determination); 557 (Second GAO Decision).

### C.  Whether the Government Assessed the Proposals Regarding SME IV Rationally

#### 1.  Whether the Government Was Rational in Assigning Plaintiff a Significant Weakness for Proposing Two Part-Time Employees to a Full-Time Position

As part of plaintiff's acceptable rating for technical approach, the TET assigned plaintiff a significant weakness for "propos[ing] the use of the SME IV as the Team Lead who will provide direction, leadership, coordination for the rest of the staff" while also "propos[ing] two part-time individuals as SME IVs" and splitting leadership duties between the two part-time individuals. *Id.* at 330 (Second TET Consensus Report). The TET found a "significant risk" of inconsistencies between the two individuals' "tracking, reporting, monitoring, and checking of deliverables." *Id.* at 330–31 (Second TET Consensus Report). The CO agreed with this evaluation. *Id.* at 344 (Second Best Value Determination Memorandum).

Plaintiff states because the solicitation did not explicitly require the position only be staffed by one person, the government "unreasonably veered from the RFQ's criteria in assigning a weakness." Pl.'s MJAR at 18. Plaintiff noted at oral argument the two part-time staffers it proposed as SMEs "are the incumbent SMEs on Syneren's contract," and they have similar project management experience of "more than 30 to 40 years." Tr. at 11:16–24.

The government argues the CO "reasonably concluded that having two individuals occupy such an important role would 'jeopardiz[e] the unity of effort in the overall work performed' and create the risk that tracking, reporting, monitoring, and checking of deliverables would not be consistent between the two individuals." Def.'s Cross-MJAR at 18–19 (citing AR at 330–31 (Second TET Consensus Report), 347 (Second Best Value Determination Memorandum)). Although the RFQ "did not expressly prohibit multiple individuals from filling a single full-time position," the government asserts "it was not irrational or unfair treatment for the agency to consider this a weakness." *Id.* at 19. The government rejects plaintiff's "proffered standard, that any practice not explicitly prohibited by the RFQ cannot constitute a weakness for evaluation purposes" and explains such a standard would lead to "overly permissive evaluations with the potential for absurd results." *Id.* The government also notes it "would be entirely consistent with full incumbent capture for Dowless to select only one of the two SME IV workers to work full time in the position." *Id.*

At oral argument, plaintiff did not dispute the Court's observation, "there's no information in the record that specifies [the two part-time employees] have been part-time employees for a long period of time, wish to remain as part-time employees, [or] will only be employed as part-time employees." Tr. at 74:20–24; 75:3–5. The government noted because defendant-intervenor planned to meet with employees as part of its incumbent capture methodology, defendant-intervenor could promote one of the part-time employees to full-time "if one wanted to go full-time." *Id.* at 68:3–7. The government also argued "[t]here's no demonstrated history that" the part-time employees' part-time status was a strength, and the lack

of history means "it's logical to say that they were retained in spite of their part-time status, not because of it." *Id.* at 76:19–77:1. Finally, the government argued it was rational for it to see "the risk avoided of not having communication would be greater than the slight risk of potentially finding somebody that might not be the same level of quality as these two individuals." *Id.* at 77:3–7.

While plaintiff argues "proposing full-time personnel was a phantom RFQ requirement," the Court agrees the government's assessment of a weakness in this category did not treat the proposal as if it were "disqualifying or otherwise represented a failure to follow the solicitation requirements." Pl.'s Reply and Resp. at 4; Def.'s Reply at 5. The Court finds it is not irrational to conclude that a full-time employee has much greater retention possibility than a part-time employee. The Court also finds the government rational in preferring a team leadership role be held by a single person, rather than by two part-time people. Thus, the government's decision here "evince[es] rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058. The Court finds the government's decision here should not be "set aside" because it is not "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc.*, 365 F.3d at 1350–51. Plaintiff's request for the Court to treat as irrational the government's assignment of plaintiff weakness because it was not explicitly grounded in a violation of the letter of the solicitation is, in this instance, a request for the Court to reevaluate the "discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co.*, 77 F.3d at 449.

### 2. Whether the Government Irrationally Failed to Consider the Risk of Defendant-Intervenor Replacing the Two Part-Time Employees with a Full-Time Employee

Plaintiff also argues because it "employed all incumbent personnel, the hiring of any other individual as SME IV [to replace the two part-time employees] would necessarily affect the Agency's receipt of services on other efforts" by taking employees away from other projects. Pl.'s MJAR at 19–20. Plaintiff asserts it was irrational for the government to not assign defendant-intervenor a risk related to this concern. *Id.* at 20. In response, the government argues "the RFQ did not require the retention of all current workers on the upper air programs," so defendant-intervenor could "select only one of the two SME IV workers to work full time in the position" to avoid disruption to other projects. Def.'s Cross-MJAR at 19. Defendant-intervenor's proposal of replacing the two part-time employees with a full-time employee could result in improved employee retention if one of the two part-time employees desired to work as a full-time employee. *See* Tr. at 68:3–7 (the government noting defendant-intervenor could promote one of the part-time employees to full-time "if one wanted to go full-time"). When the Court noted at oral argument "it's not irrational to conclude that a full-time employee has much greater retention possibility than a part-time employee," plaintiff responded part-time employee status and retention likelihood "are not necessarily connected." *Id.* at 74:24–75:9. The Court reviews not whether the two are "necessarily connected" but whether the government was reasonable in seeing the two as connected and then crediting defendant-intervenor for proposing to select one of the two employees to work full-time as a means of retaining them for the future. Technical ratings fall within a category of "discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co.*, 77 F.3d at 449. The government's decision

here "evince[es] rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058.  The Court finds the government's decision here should not be "set aside" because it is not "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc.*, 365 F.3d at 1350–51.

### D. Whether the Government's Rating of the Parties' Proposed Transition Times Was Irrational

The TET evaluated plaintiff's "transition schedule of one day" as a weakness contributing to its lower end of acceptable rating for technical approach because it "represents a risk to the Government that Syneren is overestimating its ability to transition from all the duties that the individuals perform today . . . to the current work and activities required only by upper air programs." AR at 330–32 (Second TET Consensus Report).  The TET treated defendant-intervenor's proposed four-month transition as a strength contributing to its technical approach rating of good, noting the transition plan's "methodical timeline of transition within a reasonable amount of time," which "provides the Government assurance that the company will execute the incumbent capture and new hires in a timely fashion to ensure no lapse in the work required in the program." *Id.* at 323.  The CO agreed with the TET's evaluation. *Id.* at 346 (Second Best Value Determination Memorandum).

Plaintiff argues the government's decision to treat defendant-intervenor's proposed four-month transition period as reasonable falls short of the government's desire to perform the work "without disrupting or compromising effective and efficient operations." Pl.'s MJAR at 19 (citing AR at 19 (solicitation)).  Plaintiff asserts the government's treatment of defendant-intervenor's four-month transition as a strength is not only "irrational and arbitrary in its own right, [but it also] demonstrates unequal treatment when compared with the risk" the government assigned to plaintiff's "one-day transition—for its own employees already at the Agency." *Id.*

The government argues the CO rationally decided plaintiff's "incumbency status 'does not devoid them from requiring a transition period.'" Def.'s Cross-MJAR at 19–20 (quoting AR at 347 (Second Best Value Determination)).  This was a necessity, according to the government, because the procurement is "'part of a larger overall restructuring of contractual instruments from three contracts into four contracts,' which at the very least will 'require an adjustment on Syneren's part to realign resource[s] to provide support specifically to the Upper Air Program." Def.'s Cross-MJAR at 20 (quoting AR at 347 (Second Best Value Determination)).[6]

Plaintiff asserted at oral argument its outstanding past performance rating "can't be . . . highly relevant for purposes of past performance and then not relevant for technical" because, in plaintiff's view, "[t]hese individuals are doing essentially the same work." Tr. at 42:17–20;

---

[6] The government noted at oral argument plaintiff's failure "to address the descoping . . . also reflected a lack of understanding of the performance work statements and the requirements of the solicitation." Tr. at 32:16–20.  The government explained some of the employees plaintiff proposed as part of its incumbent retention "were primarily ASOS," which would require "some transition, additional training for that person, some sort of getting on the same page" because the new contract contains only upper air work and no longer contains ASOS work—concerns plaintiff's "proposal did not address at all." *Id.* at 39:21–40:11.

42:23–24.  Plaintiff adds it was contradictory for it to receive a strong rating for incumbent capture methodology and a weakness for a one-day transition to a new contract.  *Id.* at 43:6–11.

The Court is sympathetic to plaintiff's position at oral argument its one-day transition plan was "a rational approach that made a lot of sense" based on plaintiff's incumbent status and the minimal changes in the new contract.  *Id.* at 10:8–9.  Plaintiff appears to misunderstand the government's concerns underlying its rating, however.  The government noted plaintiff's optimistic assessment left "no room for margin of error" in case plaintiff was "overestimating its ability to transition from all the duties that the individuals perform today . . . to the current work and activities required only by the Upper Air programs."  AR at 331 (Second TET Consensus Report).[7]  Plaintiff's failure to prepare for anything but a smooth transition overlooked the government's desire for offerors to demonstrate an understanding of "the overall requirements for Upper Air programs."  *Id.*[8]  The government observed defendant-intervenor's proposed transition timeline "provides the Government assurance that the company will execute the incumbent capture and new hires in a timely fashion to ensure no lapse in the work required in the program."  *Id.* at 323.[9]

As the government observed at oral argument, plaintiff "offer[ed] no support . . . other than just their own say-so" for its characterization of defendant-intervenor's proposed four-month transition as "necessarily disrupt[ing] the performance of the contract."  Tr. at 12:5–6; 80:1–3.  The Court finds the government's assignment of a risk to plaintiff's proposed one-day transition was reasonable because it was rational for the government to be concerned plaintiff was underprepared for small but important changes in the new solicitation, which could lead to delays in transition plaintiff did not foresee.  Such a determination as part of a technical rating falls within a category of "discretionary determinations of procurement officials that a court will not second guess."  *E.W. Bliss Co.*, 77 F.3d at 449.  The Court also finds the government was rational in assigning a strength to defendant-intervenor for "a methodical timeline of transition

---

[7] Plaintiff's comparison of its plan to defendant-intervenor's appears to treat the parties' respective proposed transition times as definitive statements of the actual time it will take for the parties to transition, rather than as reflections of the parties' understandings of the challenges transition could present:  "it just doesn't make common sense to say a one-day transition creates an unexplained risk where a four-month transition that would clearly disrupt the requirement is somehow methodical."  Tr. at 12:7–10.

[8] The government's concern plaintiff did not understand the new contract requirements is bolstered by two other weaknesses the government assigned to plaintiff.  First, the government noted plaintiff's list of deliverables included "artifacts for engineering and logistics for ASOS and COOP programs.  These two programs are out of scope of this solicitation."  AR at 331 (Second TET Consensus Report).  The government stated this presented a risk plaintiff "does not understand the requirements of this PWS by including activities that are clearly outside the scope of this work for Upper Air programs."  *Id.*  Second, the government noted plaintiff's acknowledgement of the risks involved in the transition yet failure to "clearly outline the methodology for handling each risk from all the risk management steps" is a sign plaintiff may not be clear about the risks or how to handle them.  *Id.*  The government sees this as creating risk of an unsuccessful transition.  *Id.*

[9] Meanwhile, according to the government, "of the people that Syneren proposed, if you look at their resumes that it provided, and based off of the work they'd be providing, the division of labor between those people, some were primarily ASOS."  Tr. at 39:21–25.  The "particular knowledge and understanding of upper air" of staffers transitioning from primarily ASOS to new solicitation's exclusive focus on upper air "may not be what's required going forward. . . .  [T]here's going to need to be some transition, additional training for that person, some sort of getting on the same page."  *Id.* at 40:2–9.

within a reasonable amount of time." *Advanced Data Concepts*, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."); AR at 323 (Second TET Consensus Report). The government did not treat the parties unequally in assigning defendant-intervenor a strength for a longer transition period and plaintiff a weakness for a shorter transition period, since a protester alleging unequal treatment in a technical evaluation "must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals," and plaintiff did not demonstrate the deficiencies in its proposed transition time were nearly identical to those in defendant-intervenor's. *Office Design Group* 951 F.3d at 1372.

### E.  Whether the Government's Past Performance Rating for Defendant-Intervenor Was Irrational

The TET rated plaintiff's past performance outstanding and rated defendant-intervenor's past performance acceptable, noting defendant-intervenor's "narratives provided in the CPARS and PPQs do not support the assigned adjectival ratings associated with the various rating areas." AR at 328, 333 (Second TET Consensus Report). The CO accepted these adjectival ratings but viewed defendant-intervenor's past performance more positively, adding: "the adjectival scale used by the agency does not provide for a rating between the level of Acceptable and the level of Outstanding for past performance, in contrast to the evaluation of Technical Approach herein which included an intermediate rating of Good. Had there been such a rating option, it would likely have been provided to Dowless' past performance." *Id.* at 348 (Second Best Value Determination Memorandum).

Plaintiff argues it was prejudiced by the CO's arbitrary past performance ratings. Pl.'s MJAR at 23. Plaintiff asserts the CO raised defendant-intervenor's past performance rating from what the TET recommended even after agreeing with the TET that two of defendant-intervenor's three past performance evaluations were unclear and of questionable accuracy. *Id.* at 22 (citing AR at 328–329 (Second TET Consensus Report), 347 (Second Best Value Determination Memorandum)). Plaintiff further alleges the CO "puff[ed] up the awardee's past performance findings without providing any rationale." Pl.'s Reply and Resp. at 1.

The government asserts plaintiff "fails to account for the fact that the Contracting Officer's assessment of Dowless's Past Performance relied on her own independent judgment." Def.'s Cross-MJAR at 23 (citing AR at 348 (Second Best Value Determination Memorandum)). According to the government, the CO "did not find the Past Performance narratives lacking to the extent that it affected her 'overall confidence in Dowless' ability to perform successfully.'" *Id.* (citing AR at 347–48 (Second Best Value Determination Memorandum)).

The CO's rating of defendant-intervenor's past performance as being on the "high end of the Acceptable rating" was lower than plaintiff's "outstanding" rating. AR at 348 (Second Best Value Determination Memorandum). While the TET noted two of defendant-intervenor's three references "lacked the narratives to substantiate the assigned Exceptional ratings," the CO agreed the narratives did not justify a high rating, but instead found the narratives to be only "somewhat

lacking, however not to the detriment in affecting the overall confidence in Dowless' ability to perform successfully." *Id.* at 347 (Second Best Value Determination Memorandum). The CO also acknowledged defendant-intervenor's past performance as a subcontractor as opposed to prime contractor: "Despite that fact, the quality of Dowless' performance was positive, giving a reasonable expectation that Dowless & Associates, Inc. will successfully perform the required effort." *Id.* at 347–48 (Second Best Value Determination Memorandum).

At oral argument, plaintiff agreed defendant-intervenor has relevant past performance, namely as a subcontractor on other NOAA contracts. Tr. at 24:18–21. Plaintiff acknowledged defendant-intervenor's reference for subcontractor Tesla "was a relevant reference and that Tesla did good work . . . ." *Id.* at 28:16–18. Tesla currently provides contract support for the Automated Surface Observing System Service Life Extension Program, thereby demonstrating its "technical expertise and experience in similar kinds of work." AR at 79 (defendant-intervenor's proposal); Tr. at 19:13–14. In performing work for NOAA, Tesla received CPARS ratings providing "more solid justification" to the government, and "greater assurance as to the quality of the work that Team Dowless would be able to provide overall." AR at 344 (Second Best Value Determination Memorandum). Defendant-intervenor's other reference, ITegrity, Inc., also provides "operational support services to the NOAA *Office of the Assistant Administrator*" by fulfilling web page maintenance and technical writing support. *Id.* at 81–82 (defendant-intervenor's proposal). The CO concluded both bidders presented past performance references within the scope and magnitude of the solicitation. *Id.* at 347 (Second Best Value Determination). To the extent plaintiff merely asserts its own past performance is superior to defendant-intervenor's, the government agreed, observing defendant-intervenor's past performance rating was still lower than plaintiff's after the CO's review. Tr. at 78:18–19.

Plaintiff does not cite any rule requiring the CO to adopt the TET's findings verbatim. The CO does not appear to be "puffing up the awardee's past performance findings without providing any rationale." *See* Pl.'s Reply and Resp. at 1. Rather, the CO carefully considered the TET's evaluations of defendant-intervenor's ratings and "did not find the Past Performance narratives lacking to the extent that it affected her 'overall confidence in Dowless' ability to perform successfully." Def.'s Cross-MJAR at 23 (citing AR at 347–48 (Second Best Value Determination Memorandum)). This is precisely the rational deliberation the law requires, and plaintiff asks the Court to evaluate "minutiae of the procurement process[,] . . . which involve[s] discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co.*, 77 F.3d at 449. Accordingly, the Court finds the CO's past performance evaluation of defendant-intervenor rational. *Advanced Data Concepts*, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

## F.  Whether the CO Was Rational in Accepting the TET's Evaluations

The CO found "that the Technical Evaluation Team Consensus Report contains sufficient information to make a sound, supportable, business award decision." AR at 346 (Second Best Value Determination Memorandum). The CO also "concur[ed] with the TET's nonprice ratings, identified technical findings and assessment of past performance" and "with the findings above that the vendors' total evaluated price has been determined fair and reasonable." *Id.* The CO

accepted these adjectival ratings but viewed defendant-intervenor's past performance more positively, adding:  "the adjectival scale used by the agency does not provide for a rating between the level of Acceptable and the level of Outstanding for past performance, in contrast to the evaluation of Technical Approach herein which included an intermediate rating of Good. Had there been such a rating option, it would likely have been provided to Dowless' past performance." *Id.* at 348.

Plaintiff argues the CO's decision to "adopt[] the strengths and weaknesses assigned to Syneren and Dowless without question . . . along is sufficient to tradeoff decision on [sic] arbitrary, capricious, and irrational technical evaluations and an unreasonable comparison of quoted prices."  Pl.'s MJAR at 20–21 (citing AR at 343 (Second Best Value Determination)). Plaintiff explained at oral argument the CO accepted "all of the strengths and all of the weaknesses proposed that the technical evaluation team found."  Tr. 12:16–19 (citing AR at 346 (Second Best Value Determination)).  According to plaintiff, "[t]hese flaws in the evaluation process rendered the source selection authority's tradeoff analysis arbitrary and capricious." Pl.'s MJAR at 21.  Plaintiff argues if the government had "properly evaluated quotations and afforded the RFQ's factors the appropriate weight, Syneren would have stood a substantial chance for award."  *Id.* at 23.

The government argues the CO "reasonably concluded that Dowless's 'Good' Technical Approach and Past Performance at the 'high end' of 'Acceptable' were superior to Syneren's 'lower end of Acceptable' Technical Approach and 'Outstanding' Past Performance."  Def.'s Cross-MJAR at 23 (citing AR at 339–40 (Second Best Value Source Selection Trade-Off Memorandum); 347–48 (Second Best Value Determination Memorandum)).  The government explains plaintiff "fails to account for the fact that the Contracting Officer's assessment of Dowless's Past Performance relied on her own independent judgment."  *Id.* (citing AR at 348 (Second Best Value Determination Memorandum)).  The government also argues because the TET's evaluation was not "fundamentally flawed and arbitrary," the CO "was not improper" in relying on the TET's evaluation.  *Id.*

The Court found *supra* the TET's evaluation and the CO's reliance on the TET's evaluation were not irrational.  Plaintiff's argument relies on a finding of "flaws in the evaluation process," but because the evaluation process was not flawed, it was not arbitrary and capricious for the CO to rely on the TET's evaluation in its tradeoff analysis.  The CO carefully considered the TET's evaluations of defendant-intervenor's ratings and closely inspected narratives underlying the TET's ratings.  *See id.* (citing AR at 347–48 (Second Best Value Determination Memorandum)).  This is precisely the rational deliberation the law requires, and plaintiff's argument asks the Court to investigate the "minutiae of the procurement process[,] . . . which involve[s] discretionary determinations of procurement officials that a court will not second guess."  *E.W. Bliss Co.*, 77 F.3d at 449.  Accordingly, the Court finds the CO's past performance evaluation of defendant-intervenor reasonable.  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks and citations omitted) (Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.").

## V.  Injunctive Relief

In its motion for judgment on the administrative record, plaintiff requested a permanent injunction.  *See* Pl.'s MJAR at 23.  The Court considers the following factors when determining whether to issue a permanent injunction:  "(1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).  According to the first factor, plaintiff is not entitled to injunctive relief because plaintiff does not prevail on the merits. The Court therefore does not consider the remaining factors of the test for a permanent injunction.  *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) ("Absent success on the merits, the other factors are irrelevant.").

## VIII.  Conclusion

For the foregoing reasons, the Court **DENIES** plaintiff's motion for judgment on the administrative record and **GRANTS** the government's cross-motion for judgment on the administrative record.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

<u>s/ Ryan T. Holte</u>
RYAN T. HOLTE
Judge